Thank you, Your Honors. May it please the Court, my name is Gene Hallman and I represent the plaintiffs in this matter. I first want to very briefly address the issue that the Court asked us to address in its recent order and that is the jurisdiction of the Court. I say I'm going to briefly address it because the Court should have received from the defendants an emergency motion to amend the petition for removal. From the plaintiff's standpoint, we agree with the factual assertions in that petition. We don't join in the petition in that motion, but we agree with the factual statement as to the true citizenship of the defendant. With that said, I will also suggest, Your Honors, that the issues in this case are fairly simple. It's been well addressed and well briefed by both parties, I hope, to provide the Court some guidance. The only unusual aspect of this case, I would suggest, is the fact that the Court initially was presented with and ruled on a motion to strike the experts' affidavits in this case, the affidavits of Dr. Bynum and Mr. Freeze. The Court, exercising its discretion, declined to strike those affidavits and agreed to consider all of the evidence contained therein. At that point, there was no contradictory expert testimony on the questions of defect in this case. The motion for summary judgment was considered in the Court, in effect We believe that that ruling was in error because it impermissibly substituted the judge's weighing of the evidence and decision concerning the facts for that of the jury. Are you suggesting that any time a party is able to offer up an expert affidavit that opines as to the ultimate issue that my side should win, summary judgment is impossible? I'm saying, in the sense, yes, Your Honor, I am, in the sense that the judge has already made the determination that that expert opinion is admissible. This is not a case Is admissibility the same thing as persuasive or sufficient to make out a prima facie case? Well, admissibility is the, if there's no opposition, well, regardless of whether there's opposition, if the judge makes an initial determination that the expert opinion meets the Daubert standards for summary judgment and is admissible, then yes, I think it does, it is sufficient in and of itself to make out a genuine issue of fact. Do you have any authority to support that proposition? Well, the two cases I cite, Your Honor, are the case of Beigler v. Kleppe, which is a Ninth Circuit case, a 1980 case, and the second one, which is probably more on point, is Maffie, M-A-F-F-E-I v. Northern Insurance, which is a 1993 Ninth Circuit case. In the Maffie case, the court held that there was no, the court concluded that expert testimony was not necessary and that the court could determine the question of fact as a matter of common sense. In other words, it was a matter that didn't need the, need... Well, the facts really don't seem to be much disputed here, are they? Even the expert opinion, to be honest, isn't much of an expert opinion. I mean, okay, something at that temperature can burn. I doubt if lay citizens know what's a third-degree burn. In fact, I don't think citizens even know what third-degree burn means. But the fact that something that's 180 degrees can cause a severe burn is probably something that we know without the expert's testimony, that the machine could be built differently is something we know without the expert's testimony. It seems to me what the district court was doing was making a legal evaluation, weighing the two alternative tests, the expectations test and the, not utility, the... Risk utility. Risk utility test. And that's the task for the court, not for an expert. So for an expert to offer up what is, I mean, the expert really isn't supposed to be called upon to offer the ultimate opinion and express it that way, but the decision is the law is one for the courts. So I'm not sure the fact that somebody's offered up expert evidence in this context really tells us very much. Well, Your Honor, it tells us that a reasonable, feasible alternative design was available, which I... I knew that. I knew they could make the chocolate less hot. Well, economically available. They'd save money by not heating it up quite so much. I understand it's important to have the expert testimony, but having an expert's stamp of approval on an argument doesn't necessarily make it all approved. Well, I agree that, well, let me see. Actually, let me shift the focus a little bit. I don't mean to take up all your time with that issue. A concern I have here has to do with really the application of the consumer expectation test, which I understand is what you argued takes this out of the decisions from Indiana, and I forgot which other state. Indiana was the primary one, Your Honor. I think you're probably right in saying that a consumer might not appreciate, certainly wouldn't appreciate the possibility of third-degree burns in a fraction of a second and so forth, but even more generically might not appreciate how severe an injury could result from very hot liquid. But I also think it's true that a consumer would anticipate that, yes, an injury could occur from very hot liquid, and perhaps most to the point, anybody who has used hot beverage dispensers should anticipate that what comes out of there at the beginning is very, very hot. What's different about this so that you would say the consumer would not have expected what happened here? Well, for one thing, Your Honor, as you pointed out, under Washington law, it's not simply that the likelihood that the product will cause harm, but the seriousness of the harm to be caused. And I think that's the distinction. And I think the primary distinction here, and the one that the district court did not acknowledge, was the fact that I think there's a different standard when you're dealing with products that are available to children. And I've cited several cases to that effect. The difference between putting a self-service coffee bar, which is one of the cases, at a height which was accessible to children in a place that was accessible to children, rather than, for example, putting a self-service coffee bar in a tavern, for example, where no children are permitted. The example I use, everybody knows that a knife is sharp and that a knife can cut. And most people going into the hardware store who pick up a knife and test it with their finger, if they cut themselves, that's a pretty much expected risk. If you put a table full of knives in a location that's accessible to children, your duties are different than they are. And the hot coffee cases that the court relied on to a case. Does it make any difference if the place is accessible to the entire universe of the general public? In a hospital corridor, you have a mixed crowd. There might be some children, there may be some people that are handicapped or in wheelchairs or what have you. But is it a question of fact or a question of law of what a reasonable consumer population would expect in a place like that? I think it does make a difference, Your Honor, because I think you have to design your product or your product dispenser for the foreseeable vulnerable person who's going to come in contact with it. And that's like my analogy of the knife case, the knife display case. That's going to be in a general store. Everybody's going to have access to it. Adults are going to have a different understanding. But if a child can walk up to it and pull a knife out and cut himself or herself, then I think it has to be designed to address that particular risk. Does a proprietor of a place that accepts the public, the general public coming in, have a duty to anticipate that children will be left unattended by careless minders? I think that's a question of fact, Your Honor. I think what the reasonable expectation, whether a child unattended might in this case mean the mother had to go to work or unattended might mean they turned their back. I think that presents a specific and a very clear fact question which would have to be determined by the jury. Thank you, Your Honor. One of his one of the opinions. Yes. Right now. But he doesn't say, in other words, how many degrees cooler it should be. And if it's safe at that lower degree, he doesn't say that, does he? No. So you are by 10 degrees. There'll be a safe product. So, I mean, I mean, it has to be hot to a certain extent. But there's there's no explanation of the difference between wherever it is. Under a degree. Sixty five degrees. Well, he does make four hundred six five degrees on your skin and be OK. He does make the distinction. And he says in his affidavit at what temperature it will cause serious deforming burns. And Your Honor, that's part of his opinion also is the fact that the safer alternative design. The reason the safer or what you would choose to say safer is still dangerous. I mean, you don't, you know, dip your hand in a bucket of whatever it is. Right. The reason that the hot chocolate is so hot and it says in the affidavit. I know why. But my question is, I mean, if it's cooler, is it safe? Well, I was going to say, Your Honor, the reason that the hot chocolate is so hot is because the coffee. I know that has to be drunk that hot chocolate doesn't. But my question is, so if you lower it 15 degrees, does it make it safe? Well, he enters. No, it makes it more safe. Well, what he says, what does that mean? Well, this would still be a dangerously hot temperature, about 168 degrees. The speed and severity of burns injuries increase exponentially with increases in temperature. So it's still very dangerous. The injury would be less severe, but the danger isn't gone. Right. And then and that's where you get into the point. So that's my point. So it's so dangerous. Right. So what are you talking about? It could have been made a little bit less dangerous. Well, that's your case. Only one of you can get, you know, compensated for part of your burn and not all of it. I mean, what can I do? I don't understand. You're right. That's only one of the his opinions. The other is to design the dispensing machine in such a way that that whether it's 160 or 180 or 200, it's not accessible to small children. Well, that was different because, well, this wasn't supposed to be accessible. The problem here is that the eight year old puts the money in, which the 22 month old obviously could not. And he goes to get the cup. He realizes it's hot. So he backs off and nobody else is there watching the 22 month old who now has access to something because the money is already in the machine. Ordinarily, the person with the money in the machine does something. So it's an unfortunate combination of ingredients. At some point, you can't design for the fact that a 22 month old is going to be let loose because 22 month olds can't reason.  Good morning and may it please the court. I'm Dan Lindahl representing the Appellee Compass Group USA. Also with me at council table is Mary Spillane representing the Defendant Crane Company. And although our time is short this morning, we were both hoping to address the court in equal amounts of time. Let me begin by addressing jurisdiction, but only insofar as to ask if the court has any questions about it. Obviously, there was a jurisdiction. There was a problem with the removal petition. We've identified it and hopefully cured it. I think the only question I have about that is whether the late amendment can be granted sort of nunk-pro-tunk to get you back into the district court. Because you're now in the appellate court. Right. We don't have any business changing history. Right. So the question is can we get you back into the district court by a nunk-pro-tunk order saying we accept your amendment since the other side doesn't object to it? Your Honor, I believe the answer to that is yes. And the authorities I've cited to the court are one, the Snell v. Cleveland case, the Ninth Circuit case that we cited in our motion. There, the document being amended was the complaint, not a removal petition. But nonetheless, the question was whether the jurisdiction allegations. It was a basic document in the jurisdiction. Correct. And also, I came across this after I wrote the motion. The McMahon case, which we cite and discuss at length concerning the merits of this, involved the very same removal defect problem that we have. And there, although Judge Easterbrook admonished counsel for their sloppy work, frankly, they also granted relief under 28 U.S.C. 1653 in the appellate court to cure the removal petition. So I believe you do. We won't admonish you because you've been punished enough. Thank you, Your Honor. Now, turning to the merits of the case, because time is short, I'm going to do sort of a choppy presentation here, primarily responding to the issues that came up during the appellant's presentation. Let me begin by addressing the contention that the McMahon case, applying Indiana law, and the McCrory case, applying Kansas law, are different because the products liability law of those states don't apply the consumer expectations test. Well, I'd invite the court to look at page 657 of the McMahon case, where it lays out that Indiana applies the consumer expectations test. And I'd invite the court to look at page 1273 of the McCrory case from the District of Kansas, where they were applying Kansas law, and they explain that Kansas also applies the consumer expectations test. Therefore, whatever basis upon which the appellant wants to challenge those decisions, there's no argument that they're different because the law in those states is different. A factual matter, Judge Clifton referred to, and maybe this was a misstatement, maybe a misunderstanding of the facts, but it actually wasn't the 8-year-old who put the money in the machine. It was the 13-year-old, which only further shows our point, which is that this machine can't be operated by a 22-month-old. It has to be operated by someone considerably older, tall enough to put the coins in, and that's what happened here. In fact, the plaintiff focuses on the fact that the injury here was to a 22-month-old child. But this product wasn't a product created, designed, marketed. It wasn't to children. It wasn't either purchased by a child, nor was it purchased for her consumption. It was purchased by a 13-year-old for consumption by an 8-year-old. It's entirely fortuitous that it happened to be hot chocolate as opposed to something else, but the plaintiff's trying to turn that into a basis to argue this was a child product. One further point. The plaintiff argues that this case is different and should be viewed in the context of products used by children, and that there's a child standard for evaluating a product's defectiveness as opposed to an adult standard. In that respect, I draw the Court's attention to a case the plaintiff cited and relied on, Novak v. Piggly Wiggly. It's a BB gun case, and in that case, BB guns, as we know, or in that case, the assertion was, the manufacturer made these BB guns and then sold them, marketed them for use by children. And in that case, the BB gun had been purchased by an 11-year-old without the knowledge of his parents. The plaintiff urged the Washington Court of Appeals and Novak to view this as the plaintiff does here in the context of sort of a child standard for the product. And the Washington Court of Appeals said, no, we evaluate the product's dangerousness in a strict liability case under the standard of an ordinary adult consumer. And that's at page 794 and 95 of that Novak decision. Therefore, the water – I mean, isn't there some difference? I mean, if you've got a product which you anticipate is going to be used by children, wouldn't that factor into it someplace? Well, I think in the Ayers case from the Washington Supreme Court, we had baby oil, which is, in fact, of course, created for the purpose of being used with infants. Yes, it does – I think it would come into play. You change the facts of this case, for example. Suppose the dispenser was much more readily available to a young child. I mean, you make the arguments that because of the need to put the money in at a higher level and push the buttons and so forth to manipulate the machine to get the hot beverage to come out, it takes someone of greater age to operate it. If, in fact, you had something that a 3-year-old could stumble up to push the button, of a kind of product that would be attractive to a 3-year-old, you may have a very different set of concerns, and your client would have reason to have a substantially larger reserve for the case. The position or the sort of facts you postulate, Your Honor, really are very similar to the kinds of cases the plaintiff has relied on, which are cases where a hot beverage is left out in an area where children can come upon it. Those are all negligence cases. And had a defendant in this case left a steaming hot pot of tea, as in one of the plaintiff's cases that he cites, out where children can come upon it randomly, yeah, we'd have a different case. But none of the cases the plaintiff cites are product liability cases. None of those cases say that the hot beverage is an unreasonably dangerous product. They're all negligence cases where a waitress, for example, left a steaming hot pot of tea with a child sitting there, and the theory was that was unreasonable conduct. Unless there's any further questions, I do want to... standard at some level for a product that's attractive to children, even under a product liability theory. Let me leave the rest of the time for Ms. Spillane. Good morning. I'm Mary Spillane, and I represent the Crane Company, the manufacturer of the hot beverage dispenser. To address your question, first of all, Your Honor, I think that there perhaps is, in the circumstance where you have manufactured a product that is easily accessible to children of tender years, that there may be a different standard, because there you've targeted the machine for those children. But that is not the facts of this case. As the Court's already pointed out, there were any number of factors built into this machine that made it so that a child of Marissa's age could not have gotten to the drink by herself. An adult had to put in the coins. An adult had to push the button. An adult didn't have to put in the coins. I'm sorry. Somebody of certain height. Of certain height. And in this case, people who were the caretakers at that point in time and were there to watch out for the children, the teenagers, were doing that. And in fact, when they knew that the cup was too hot, Cecilia even pushed it back after David had set it out on the machine so that it was out of the way of the children. Would you focus on, this is where I'm having my problems, on the consumer expectation test as it applies to this case in this sense. As I understand the plaintiff's case, it's just that, if this is the correct way to put the test, an ordinary consumer would not expect hot chocolate to be this hot. In other words, it's the excessive heat of the chocolate that makes this an unsafe product. What is your response to that? Or why is it excessively hot, first of all? Well, in fact, they haven't produced evidence that it truly is excessively hot because it was within industry standards, the standards at which hot beverages are typically dispensed. But more importantly, their expert did not identify any temperature at which it would be safe. And in fact, opined that even at 130 degrees, the hot chocolate could cause third-degree burns in less than 30 seconds. So that we have temperatures that are getting so low that ultimately it wouldn't be hot chocolate if, in fact, we dispensed at those temperatures. And no one has said that the reasonable consumer expects that, in fact, temperature will be, or that hot chocolate will be dispensed at a temperature that cannot possibly cause a burn or even a severe burn. You say no one has said. I think the Ohio Court of Appeals in Nadell v. Burger King would say that it was a jury question whether a consumer would expect the temperature to cause burns or serious burns. And I would submit that that is based on a statement of law that is not applicable in Washington, that, in fact, the existence of the injury itself is Oregon. But we're under Washington law in this case. But at any rate, the mere existence of the injury itself or the nature of the injury is sufficient to show that the product is unreasonably safe, unsafe, or not reasonably safe. You're saying Ohio law is different? I'm saying that to the extent that the Ohio court, in a very cursory opinion, said we think that the temperature is a question of fact for the jury and whether they would reasonably expect that. Based on the fact that the injury occurred would not be appropriate under Washington law because Washington law is clear that the mere existence of the injury is insufficient to establish the unsafeness of the product. Does Washington law – I realize that we're over time, but this is an interesting question. Does Washington law permit a trial judge to decide on the utility risk balancing test or the consumer expectation test? Under Washington law, a plaintiff can prove their case on design defect or inadequate warning using either test. Either test. Either test can be applied. Is Washington law more plaintiff-friendly than, say, Illinois or Kansas? I'm not sure I know the answer to that question. As a defense lawyer in Washington, I view it as pretty plaintiff-friendly. But nonetheless, I don't know how to compare it to Ohio. Thank you, Your Honor. Thank counsel for their arguments. The case to start is submitted. Next case this morning, Whitford v. Barnhart. Thank you.
judges: Goodwin, Tashima, Clifton